UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

J.R. PETTWAY,

          *Plaintiff*,

*v.*

JERRY BUSH, et al.,

       *Defendants*.

_____/

CASE NO. 19-11201

DISTRICT JUDGE ROBERT H. CLELAND

MAGISTRATE JUDGE PATRICIA T. MORRIS

## REPORT AND RECOMMENDATION ON PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
### (ECF No. 23)

## I.   RECOMMENDATION

In this prisoner civil rights case, *pro se* Plaintiff J.R. Quinton Pettway claims that Defendants (prison staff and officials) acted with deliberate indifference, in violation of his Eighth Amendment rights, by subjecting him to toxic black mold, leading to a host of serious medical conditions which Defendants failed to adequately treat. (ECF No. 1.) He also alleges that one Defendant assaulted him when he fainted and fell in December 2018 due to his poor physical condition. (*Id.*, PageID.18.) Before the Court is Plaintiff's second motion for a temporary restraining order (TRO) and preliminary injunction that would require Defendants to immediately arrange for Plaintiff's further medical treatment. (ECF Nos. 5, 23.) The Court denied the first motion, (ECF No. 10), and for the reasons that follow I **RECOMMEND** that the second motion be **DENIED** as well.

1

## II.    REPORT

### A.    Factual and Procedural Background

Plaintiff's complaint recounts his medical conditions and treatment after he was allegedly exposed to toxic black mold in August 2018. (ECF No. 1, PageID.11-20.) Soon after exposure, he suffered from congestion, coughing, blurred vision, nausea, dizziness, rashes, wheezing, chest pain, and migraines. (*Id.*, PageID.11.) Later, he began couching up fungus spores and blood, feeling fatigued, and experiencing shortness of breath, joint aches, itching, swelling, spasms, walking problems, irregular heartbeat, high blood pressure, and insomnia. (*Id.*, PageID.15.) His requests to be moved were ignored but he did receive multiple rounds of medical treatment, which he claims was insufficient. (*Id.*, PageID.11-12.) He contends that he explained his symptoms to the medical providers and prison staff, but they failed to provide the treatment he believed was necessary. (*Id.*)

The same story replayed after he was transferred later that month to G. Robert Cotton Correctional Facility (JCF): the treatment he received was inadequate, in his opinion. (*Id.*, PageID.12-20.) His visits with medical providers were frequent; he saw them at least 10 times in September 2018 alone. (*Id.*, PageID.13.) They simply checked his vitals but failed to offer additional treatment or allow him to see physicians, and they rejected his requests to see a specialist. (*Id.*) However, he also claims that they prescribed him an inhaler to administer albuterol, which he suggests worsened his condition, a fact later confirmed when he saw a "spirometrist." (*Id.*, PageID.13, 15.) Yet they kept advising him to take the albuterol. (*Id.*, PageID.13-14.) They also requested his sputum for testing, but he contends they erected dilatory barriers to his delivering the samples. (*Id.*, PageID.13.)

2

They did, however, give him "a detail restricting him not to got to work detail based on clear signs of pain, wheezing and shortness of breath," and he subsequently received "another no work assignment temporary detail based on his declining health condition." (*Id.*, PageID.13-14; *see also id.*, PageID.15 (mentioning another "no work assignment temporary detail").)

After a few weeks, he was informed that he did in fact have a bacterial lung infection. (*Id.*, PageID.14.) But he was not told what type of bacteria, thus preventing him from determining whether it "was the same as mold/fungus." (*Id.*) It took three days for them to disclose the type of infection but they still did not tell him the bacteria type. (*Id.*, PageID.14-15.) Plaintiff also mentions taking Zithromax around this time, which he says did not help his infection and caused side effects. (*Id.*, PageID.14-15.) He also received Amoxicillin, which failed to abate his decline. (*Id.*, PageID.15.) His renewed request to see a specialist was put off until he received a spirometry test. (*Id.*, PageID.14.) When he eventually underwent that test, he was told "his lungs were functioning far below the normal standard" and that he should see a pulmonologist. (*Id.*, PageID.15.) The "system interpreted plaintiff as having Interstitial Lung Disorder Pneumonitis" and he needed more testing. (*Id.*) Next he received emergency treatment but was misdiagnosed with bronchitis and not prescribed medications or referred to a specialist. (*Id.*)

At another time, he was sent to the emergency room at a hospital in Jackson where the physician misdiagnosed him with bronchitis, prescribed a prednisone steroid shot through his IV, refused to collect Plaintiff's testing for sputum, failed to refer him to a

specialist, and prematurely discharged Plaintiff without treating his lung infection, the underlying cause of his condition. (*Id.*, PageID.16.)

Plaintiff also states that Defendants had been altering and falsifying his medical records to prevent him from receiving necessary care. (*Id.*) Plaintiff "continued to request to know the actual term results of [his] sputum samples and was continuosly [*sic*] denied." (*Id.*) In addition, he alleges that Defendants "staged plaintiff missing appointments where in the electronic health record would reflect appointments at times prior to and after plaintiff had 'callout/assignment.'" (*Id.*, PageID.17.)

The shoddy treatments continued into November 2018 when another Defendant reviewed his vitals but "ignored all of his symptoms and denied making a referal [*sic*] to see a lung specialist when he requested." (*Id.*) Eventually, the Defendant told him that "the alleged bacteria found in his October 1, 2018 sputum sample was: 'enterobacter clocea,' but would not tell him what it meant or the results of his October 3, 2018 sputum sample." (*Id.*) Based on his own research, Plaintiff determined that this form of bacteria "commonly is found in animal intestines. This information did not sit right with Plaintiff as he thought it was clear error and that there was no way possible such a bacteria could be in his lungs." (*Id.*)

In December, the referral to a pulmonologist was again put off, this time until after an upcoming sleep apnea study. (*Id.*) At an appointment that month, and another a few days later, the Defendant medical provider merely reviewed his vitals and chart, ignored his symptoms, and refused to provide further care. (*Id.*, PageID.18.) Plaintiff was finally told that the October 3 sputum test showed streptococci, which causes strep throat. (*Id.*) "On

4

information and belief," Plaintiff writes, "this result was an error as Plaintiff had no symptoms of said illness." (*Id.*) At this point, it dawned on Plaintiff that a conspiracy was afoot to keep him "from knowing said conflicting information. Plaintiff on information and belief found both medically and/or scientifically did he have either bacteria in him when tested providing same samples. If anything he would have had both bacterias show up in both results." (*Id.*) Also in December, Plaintiff's medical condition caused him to faint and fall while eating, at which time a Defendant physically assaulted him. (*Id.*)

At another visit, he spit up black spores, mucous, blood, and white fluid, that was collected and tested. (*Id.*, PageID.19.) The results were, again, withheld from Plaintiff. (*Id.*) Despite receiving a script for 10 days of Bactrim, he ended up getting only 7.5 days' worth of the prescription. (*Id.*) When the medication failed to make him feel better, Plaintiff "realized the Bactrim was prescribed not to cure his infection, but to manipulate his blood levels for a future planned blood draw to appear normal." (*Id.*) Later, his sputum results supposedly "came back as nothing," which Plaintiff alleges "is clear evidence of fraud as plaintiffs sputum samples had been altered and/or tampered with by Defendants as there allegedily were no fungus spores, saliva dna, blood dna or food particles." (*Id.* (*sic* throughout).)

For relief, his complaint seeks an injunction requiring Defendants "to immediately make arrangements for Plaintiff to get the necessary care he needs," including that he receive treatment by a pulmonologist and infectious disease specialist. (*Id.*, PageID.21.) He also requests monetary damages. (*Id.*)

In May 2019, Plaintiff filed his first motion for a temporary restraining order and preliminary injunction, repeating his complaint's request for such relief nearly verbatim. (ECF No. 5, PageID.42.) He noted that toxic black mold can cause sudden death or tortuous pain, which constituted irreparable harm; the harm to Defendants of providing the relief is minimal; he would likely succeed on the merits because deliberate indifference is a constitutional violation; and the public has an interest in requiring prison officials to obey the law. (*Id.*, PageID.44-49.) In an order from June 2019, the Court denied the motion because it was "not persuaded that Plaintiff has shown that 'immediate and irreparable injury, loss, or damage will result . . . before the adverse party or that party's attorney can be heard in opposition.'" (ECF No. 10, PageID.68 (*quoting* Fed. R. Civ. P. 65(b)(1)(A)).)

## B.   Argument and Analysis

Plaintiff's present motion asks for the same relief that was rejected in his first: an order for prison officials "to accommodate and respond immediately to his medical needs by making arrangements and sending Plaintiff to be evaluated and treated by qualified health specialist(s)," such as pulmonologists, neurologists, optometrists, and infection disease specialists. (ECF No. 23, PageID.215.) His underlying legal argument remains substantively unchanged: his life is threatened as a result of constitutional violations, thus he faces irreparable harm; this harm outweighs the hardships Defendants would face in obtaining for him proper medical care, something they are obligated to do anyway; he will likely succeed on the merits because Defendants have intentionally denied him medical care, violating his constitutional rights; and the public has an interest in forcing prison officials to obey the law. (*Id.*, PageID.225-227.) The difference with this motion is it is

6

bolstered by medical records he obtained through discovery; although he does not explain specifically how these support various assertions (such as that the records were falsified), he cites them in his declaration to substantiate basic claims, such as that he had a fungal infection. (*Id.*, PageID.217-219.)

Many of the records he attaches to the motion are the raw laboratory results from sputum testing. (*Id.*, PageID.231-257.) The other attachments are reports from medical appointments and copies of Plaintiff's requests for healthcare. (*Id.*, PageID.258-308.) These reports recount Plaintiff's complaints, examination results, and treatments he received. (*Id.*) In several, the medical providers observed that his complaints were mostly unsubstantiated, (*id.*, PageID.259), and laboratory results were negative and vital signs normal, (*id.*, PageID.262, 271, 290, 295).[1]

In determining whether a TRO or preliminary injunction should be granted, courts consider the following factors:

> (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff could suffer irreparable harm without the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of the injunction on the public interest.

*Monaghan v. Sebelius*, 916 F. Supp. 2d 802, 807 (E.D. Mich. 2012). Because preliminary relief is "an extraordinary remedy," the movant must make a far more stringent showing of proof than that required to survive summary judgment. *Winger v. Nat. Res. Def. Council,*

---

[1] Because Plaintiff has offered different evidence with his second motion, and his motion fails on the merits, I will assume that the law of the case doctrine does not preclude him from re-raising this issue despite the previous ruling against him. *See Balsley v. Thermo Power Corp.*, 151 F. Supp. 2d 872, 876 (E.D. Mich. 2001) (explaining that the law of the case doctrine precludes reopening issues decided earlier in the same case unless, among other things, substantially different evidence is presented).

*Inc.*, 555 U.S. 7, 24 (2008); *see Farnsworth v. Nationstar Mortg., LLC*, 569 F. App'x 421, 425 (6th Cir. 2014). "Although no one factor is controlling," a movant who cannot demonstrate likelihood of success on the merits typically cannot obtain preliminary relief. *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000). Even so, a plaintiff need not present an "overwhelming" showing of potential success on the merits in order to prevail. *Sellers v. Univ. of Rio Grande*, 838 F. Supp. 2d 677, 679 (S.D. Ohio 2012). Further, "where a prison inmate seeks an order enjoining state prison officials, the court is required to proceed with the utmost care and must recognize the unique nature of the prison setting." *Sango v. Wakley*, 2014 WL 3894652, at *2 (W.D. Mich. Aug. 8, 2014).

Federal Rule of Civil Procedure 65(b) imposes additional safeguards on the issuance of TROs because they may be granted *ex parte*. Their issuance may occur without written or oral notice to an adverse party *only* if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition" and the movant "certifies in writing any efforts made to give notice and the reasons why it should not be required." *Id.* 65(b)(1)(A)-(B). Such relief, if granted, may last a maximum of fourteen days absent an extension for good cause or pursuant to consent from an adverse party. *Id.* 65(b)(2). The court must also schedule a preliminary-injunction hearing "at the earliest possible time," where the party who obtained the order must proceed with the motion or else forfeit the relief. *Id.* 65(b)(3). And the adverse party "may appear and move to dissolve or modify the order" on two days' notice to "the party who obtained the order without notice . . . ." *Id.* 65(b)(4).

8

Turning to the first factor, the likelihood of success, the nub of Plaintiff's complaint is that Defendants were deliberately indifferent to his serious medical needs and therefore violated the Eighth Amendment's Cruel and Unusual Punishment Clause. To establish his claim, the allegations must show Defendants' "sufficiently harmful" acts or omissions. *Id.* at 106. "[I]nadvertent failure to provide adequate medical care . . . will not violate the Constitution." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). The "deliberate indifference" inquiry has objective and subjective elements. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).[2] The objective inquiry asks whether the deprivation was "sufficiently serious," which a claimant satisfies when his or her condition "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 897 (6th Cir. 2004) (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)) (internal quotation marks omitted). In cases like the present involving claims that Defendants failed to provide sufficient medical treatment, the Sixth Circuit requires objective medical proof of the treatment's inadequacy:

> But when an inmate has received on-going treatment for his condition and claims that this treatment was inadequate, the objective component of an Eighth Amendment claim requires a showing of care "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be

---

[2] The subjective inquiry considers whether the official's state of mind was sufficiently culpable; it requires a showing that an official "'knows of and disregards an excessive risk to inmate health or safety[.]'" *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (quoting *Farmer*, 511 U.S. at 837). "[T]he official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Id.* Inferences from circumstantial evidence can suffice to satisfy the subjective showing. *Magnum v. Repp*, 674 F. App'x 531, 537 (6th Cir. 2017). Because the likelihood of success on Plaintiff's claim founders on the objective prong, I will not apply the subjective prong.

intolerable to fundamental fairness." *See Miller v. Calhoun Cty.*, 408 F.3d 803, 819 (6th Cir. 2005) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989) ). The plaintiff must present enough evidence for a factfinder to evaluate the adequacy of the treatment provided and the severity of the harm caused by the allegedly inadequate treatment. There must be "medical proof that the provided treatment was not an adequate medical treatment of [the inmate's] condition or pain." *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013). This will often require "expert medical testimony ... showing the medical necessity for" the desired treatment and "the inadequacy of the treatments" the inmate received. *Anthony v. Swanson*, 701 F. App'x 460, 464 (6th Cir. 2017); *see Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017) (explaining that adequacy-of-care claims may require expert testimony "to create a genuine dispute that the prisoner's medical needs are serious"). The plaintiff also must "place verifying medical evidence in the record to establish the detrimental effect" of the inadequate treatment.

*Rhinehart v. Scutt*, 894 F.3d 721, 737-738 (6th Cir. 2018); *cf. Nelson v. Shuffman*, 603 F.3d 439, 449 (8th Cir. 2010) ("In the fact of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that she did not feel she received adequate treatment." (citation omitted)).

As the record stands, I fail to see a likelihood of success for Plaintiff's claim. His core contention is that the care he received was inadequate, yet he offers only his own subjective complaints and self-diagnoses for support. Consequently, he pits his heretofore unsupported medical judgment against Defendants', which is now memorialized in the medical record he provides. But a mere difference of opinion on the course of treatment, or even a showing of medical malpractice, is not enough to support an Eighth Amendment claim. *Bright v. Martin*, 37 F. App'x 136, 138 (6th Cir. 2002) ("In sum, it is clear that Bright received medical treatment for many years while incarcerated and has now concluded that he has a liver condition which Dr. Messany did not treat properly. Accepting

Bright's allegations as true, they amount to a medical malpractice claim and not an Eighth Amendment claim."); *Powell v. Messary*, 11 F. App'x 389, 390 (6th Cir. 2001) ("An examination of the record shows that the defendants provided Powell with medical treatment for his condition, even though he may not have been satisfied with the treatment that he received. . . . Under these circumstances, Powell has alleged no more than a medical malpractice claim that is not cognizable under 42 U.S.C. § 1983."). This rule results from courts' justifiable reluctance "to second guess medical judgments." *Oliver v. Wolfenbarger*, 2008 WL 4387210, at *8 (E.D. Mich. Sept. 24, 2008) (citing *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976)); *see also Chacon v. Ofogh*, 2008 WL 4146142, at *3 (W.D. Va. Sept. 8, 2008) ("[C]laims of medical judgment are not subject to judicial review.").

These principles apply to motions for preliminary injunctions. *See Couch v. Ahmed*, 2015 WL 5145552, at *3 (S.D. Ohio Sept. 1, 2015) ("In the preliminary injunction context, a prisoner's disagreement with the adequacy of treatment by prison medical professionals does not suffice to establish a likelihood of success on the merits."). As such, I conclude that Plaintiff has failed to demonstrate a likelihood of success on the merits. *Cf. Price v. Correct Care Solutions*, 2018 WL 7075285, at *4 (E.D. Ky. July 23, 2018) (rejecting inmate's motion for preliminary injunction based on a deliberate indifference claim when he provided no evidence aside from his own declarations that the requested treatments would provide benefits).

The next consideration is the potential for irreparable harm. "To demonstrate irreparable harm, the plaintiffs must show . . . they will suffer 'actual and imminent' harm

11

rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006) (citation omitted). Because Plaintiff "has not shown a continuing violation of his Eighth Amendment rights, . . . the irreparable injury must be more than his allegation of a constitutional violation." *Rhinehart v. Scutt*, 509 F. App'x 510, 514 (6th Cir. 2013). In *Rhinehart*, as here, the plaintiff sought an injunction requiring that he see a medical specialist—in that case, a liver specialist, because the plaintiff claimed that liver disease had nearly killed him. *Id.* The court held that "the seriousness of his condition is not, without some constitutional deprivation, enough to show a harm that requires relief prior to adjudication of his claims." *Id.* It was sufficient that the plaintiff was receiving some care and the medical records did not support the specific treatment the plaintiff sought. *Id.* at 514-515.

Here, too, Plaintiff has received consistent treatment and the irreparable harms he fears have not eventuated since his alleged exposure to the toxic mold over a year ago. The records indicate that additional treatment is unnecessary and Plaintiff has not given the Court any reason to credit his theory that these documents have been falsified. (ECF No. 23, PageID.259, 262, 271, 290, 295.) If anything, then, the case for irreparable harm has weakened since this Court's prior order. *Cf. Price*, 2018 WL 7075285, at *6 (rejecting motion for injunction when plaintiff "fail[ed] to establish that his medical conditions will worsen if he does not receive his requested relief immediately"). Therefore, I am unconvinced that Plaintiff is threatened with actual irreparable injury absent an injunction—the harm he alleges remains speculative and unsubstantiated.

Regarding the next factor—weighing the competing interests—"[t]he balance that is then left is between [Plaintiff's] interest in immediately receiving care for a health condition that is unlikely to result in irreparable harm and the defendants' interests in managing their medical procedures and resources and avoiding an expenditure without a merits determination by a court." *Rhinehart*, 509 F. App'x at 516. As in *Rhinehart*, "[t]his balance weigh[s] against a preliminary injunction." *Id.*

As to the final factor, because Plaintiff has not demonstrated a likelihood of success, there is no reason to believe that constitutional violations are ongoing. As such, the public interest favors "leaving the administration of prisons to prison administrators." *Price*, 2018 WL 7075285, at *6. Indeed, "in the absence of a likely constitutional violation, . . . separation of powers and federalism strongly discourage the federal courts from entangling themselves in the administration of state prison health care systems." *Rhinehart*, 509 F. App'x at 516. Therefore, Plaintiff has not shown that the public interest requires an injunction.

It should also be noted that preliminary injunctions and TROs are not designed to afford the relief Plaintiff seeks. "The purpose of pretrial injunctive relief is 'to preserve the relative positions of the parties until a trial on the merits can be held.'" *Id.* at 513 (*quoting Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). Granting Plaintiff's motion would instead disrupt the status quo and give him almost all he asks for in his complaint. *Cf. Couch*, 2015 WL 5145552, at *4 ("Plaintiff does not seek to preserve the status quo. Instead, he seeks to obtain affirmative relief in the form [of] a transfer to Franklin Medical Center and a writ directing that he be brought before the Court. Such affirmative relief does

not serve the purpose of a preliminary injunction."). Motions seeking such proactive relief are disfavored. *See Cox v. Jackson*, 579 F. Supp. 2d 831, 855 (E.D. Mich. 2008).

### C.     Conclusion

For the reasons above, I **RECOMMEND** that Plaintiff's motion be **DENIED**. (ECF No. 23.)

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); see also 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge. Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections

in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  December 6, 2019

S/ PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge

### CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.  A copy was also sent via First Class Mail to J.R. Pettway #290284 at G. Robert Cotton Correctional Facility, 3500 N. Elm Road, Jackson, MI 49201.

Date: December 6, 2019

By s/Kristen Castaneda
Case Manager